CLERK'S OFFICE U.S. DIST. COURT
AT ABINGDON, VA
FILED

MAR - 9 2006

JOHN F. CORCORAN, CLERK
BY: _____
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **MARTIN R. GENUSA,** | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 2:05cv00028 |
| v. | ) | |
| | ) | **MEMORANDUM OPINION** |
| **JO ANNE B. BARNHARDT,** | ) | |
| **Commissioner of Social Security** | ) | BY: GLEN M. WILLIAMS |
| Defendant. | ) | Senior United States District Judge |
| | ) | |
| | ) | |

In this social security case, the court vacates the final decision of the Commissioner denying benefits and remands the claims to the Commissioner for further development consistent with this Memorandum Opinion.

### I. Background and Standard of Review

In this case, plaintiff, Martin R. Genusa, ("Genusa"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying the plaintiff's claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 and 1381 *et seq*. (West 2003 & Supp. 2005). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

-1-

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence, but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

Genusa filed his applications for DIB and SSI on or about May 12, 2003, alleging disability as of March 30, 2001, due to a damaged and degenerative spinal disc that caused severe pain and nerve damage to his hips and shoulders. (Record, ("R"), at 57-60, 64, 276-80.) His claims were denied initially and on reconsideration. (R. at 36-42, 45-47, 282-86.) Genusa then requested a hearing before an administrative law judge, ("ALJ"). (R. at 48.) The ALJ held a hearing on October 14, 2004, during which Genusa was represented by counsel. (R. at 292-319.)

By decision dated November 22, 2004, the ALJ denied Genusa's claim. (R. at 13-25.) The ALJ found that Genusa was insured for DIB purposes through November 22, 2004.[1] (R. at 23.) Furthermore, the ALJ found that Genusa had not engaged in substantial gainful activity since the alleged onset of disability. (R. at 24.)

---

[1] Thus, for DIB purposes, it must be determined whether Genusa was disabled at some point on or prior to November 22, 2004

-2-

The ALJ found that Genusa suffered from a severe musculoskeletal impairment but that Genusa did not have an impairment or combination of impairments listed at or medically equal to one listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 24.) The ALJ also found that Genusa's allegations regarding his limitations were not totally credible. (R. at 24.) After considering the medical opinions of record regarding the severity of Genusa's impairments and the testimony from a vocational expert, the ALJ found that Genusa had the residual functional capacity to perform a wide range of light[2] work, which could be performed despite Genusa's need for postural changes every hour and his complete limitation in overhead lifting and of the following repetitive motions: bending at the waist, squatting, kneeling, crawling and stooping. (R. at 24.) Based on Genusa's residual functional capacity, the ALJ found that Genusa was unable to perform his past relevant work. (R. at 24.) Based on Genusa's age, education, past work and residual functional capacity and the testimony of a vocational expert, the ALJ found that there were a significant number of jobs in the national economy that Genusa could perform, such as work as a food checker/cashier, parking lot attendant, information clerk, interviewer and desk clerk. (R. at 24.) Thus, the ALJ found that Genusa was not under a disability as defined by the Act at any time through the date of the decision and not eligible for benefits. (R. at 24.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2005).

After the ALJ issued his opinion, Genusa pursued his administrative appeals, (R. at 12), but the Appeals Council denied his request for review. (R. at 6-8.) Genusa

---

[2]The regulations define light work as work that involves lifting objects weighing no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. If someone can do light work, he also can do sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2005).

then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2005). The case is before this court on the Commissioner's Motion For Summary Judgment, filed December 14, 2005, (Docket Item No. 13), and Genusa's Motion For Summary Judgment filed November 15, 2005. (Docket Item No. 11.)

## II. Facts

Genusa was born in 1957, (R. at 384), which classifies him as a younger person under 20 C.F.R. §§ 404.1563(c), 416.963(c). Genusa completed high school and took classes while serving in the United States Navy. (R. at 296.) In the Navy, Genusa served as a hospital corpsman and ophthalmologic surgical assistant. (R. at 296.) His other past work experience includes service and installation, store owner and work as a transmitter engineer. (R. at 297-98, 301.)

At his hearing, Genusa testified that during the last year of his employment he experienced severe low back pain that pinched the nerves in his right leg. (R. at 303.) Genusa stated that this pain caused numbness in his right leg and stiffness in his neck, which made him unable to turn his head to either side. (R. at 303.) Genusa testified that after a workday, he had to use heat and ice in order to become mobile again. (R. at 303.)

Genusa described his current pain as significantly worse than that from which he suffered when he last worked. (R. at 304.) Genusa stated that the pain was constant despite a heavy regimen of medication. (R. at 304.) Genusa further testified

-4-

that the pain precluded him from helping around the house or engaging in hobbies. (R. at 304.) Genusa indicated that his doctors told him nothing could be done for his low back and neck pain from a surgical standpoint. (R. at 305.) Treatment with a gastroenterologist also did not alleviate Genusa's pain. (R. at 305.) Genusa stated that he was currently taking Percocet and was working with his doctors to find a medication for his gastrointestinal problems that would not aggravate his ulcer. (R. at 305-06.)

Genusa also testified that he experienced pain in his hands, shoulders and arms, which he attributed to overcompensating for his back, and arthritis. (R. at 306, 310.) Genusa stated that his hands swelled and stiffened during the night due to arthritis, and he would be unable to use them for up to two hours. (R. at 305-06.) Genusa also complained of leg pain, mostly in the right leg, from a nerve that was being pinched by the L3. (R. at 309.) Genusa further indicated that he spent approximately three hours a day alternating heat and ice among his lower back, neck and other ailing joints. (R. at 307.) Genusa further stated that he had switched from leather shoes to tennis shoes to ease the impact with the ground when he walked. (R. at 307-08.)

When describing his physical limitations, Genusa estimated that he could sit for only 30 minutes to an hour before he was forced to stretch or move around and could stand for approximately 25 to 30 minutes before he experienced excruciating pain in his lower back. (R. at 308-09.) Genusa testified that for the last three years, he had been forced to lie down for approximately two to four hours per day because of his severe back pain, which would render him unable to walk. (R. at 307-08.) Genusa testified that he walked much slower than before he became disabled and had

-5-

developed a limp from the nerve damage in his right leg. (R. at 309.) Genusa further stated that bending was so difficult that he would sit and prop his feet up in order to try to reach his feet to tie his shoes. (R. at 309.) Genusa also stated that he could not comfortably lift items weighing more than five pounds. (R. at 309.)

Genusa also described his depressive symptoms of irritability, grouchiness and a short attention span, for which he was prescribed Wellbutrin. (R. at 310.) Genusa stated that Wellbutrin calmed him and helped him accept his physical limitations. (R. at 310-11.) Furthermore, Genusa testified that his doctors planned to refer him to a mental health specialist but had not previously done so. (R. at 312-13.)

When asked to describe how his impairments have affected his daily life, Genusa stated that he generally stayed at home and did not go out. (R. at 311.) Genusa indicated that he was unable to drive because of his heavy regimen of medication. (R. at 311.) Genusa further testified that he experienced side effects of drowsiness, tiredness and lack of motivation from some of his medicines. (R. at 313.)

Cathy Sanders, a vocational expert, also testified at Genusa's hearing. (R. at 314.) Sanders described all of Genusa's work experience as "heavy and skilled." (R. at 314.) Sanders was then asked to consider Genusa's age, education and past relevant work experience and to assume that Genusa had the residual functional capacity for light work but could perform none of the following: overhead lifting; repetitive waist bending; or repetitive squatting, kneeling, crawling or stooping. (R. at 315.) Sanders was further asked to assume that Genusa would need a job allowing frequent postural changes as often as every one-half to one hour. (R. at 315.)

-6-

Sanders testified that there were not a significant number of jobs in the regional or national economy that such an individual could perform. (R. at 315.) In Sanders's opinion, the need for postural changes every 30 minutes would limit Genusa the most because this requirement would prohibit him from completing a task at a station of work. (R. at 315.) Sanders further stated that the inability to perform overhead work would preclude Genusa from totally performing any remaining jobs, such as work as a cashier or general office clerk, because of an inability to put items away. (R. at 315.) Sanders added that if Genusa needed postural changes every hour, instead of every 30 minutes, then he would be capable of completing some tasks, which would make him eligible for positions such as a food-checker-type cashier, parking lot attendant, information clerk, desk clerk and interviewer. (R. at 316.) Sanders testified that there were approximately 175,000 of these jobs in the national economy and 1,600 in the regional economy. (R. at 316.) However, Sanders stated that these jobs would not be available to Genusa, if in addition to a need for postural changes every hour, he also had no useful ability to deal with work stresses and only a fair ability to follow work rules, relate to co-workers, deal with the public, interact with supervisors and maintain attention and concentration. (R. at 316-17.) Sanders further testified that there would be no jobs available to Genusa if he was limited to standing for three hours in an eight-hour workday and sitting for three hours in an eight-hour workday due to the fact that these limitations allow for less than a full range of light or sedentary work. (R. at 317.)

In rendering his decision, the ALJ reviewed records from Dr. Norman C. Ratliff, M.D.; Dr. James P. Senter, M.D.; Dominion Health and Fitness; Julie Jennings, PH.D., a state agency psycholgoist; Dr. Kevin Blackwell, D.O.; Dr. Frank

M. Johnson, M.D., a state agency physician; Mountain Comprehensive Health Corporation; Dickenson County Medical Center; St. Mary's Hospital; and Sullivan Digestive Center.

On December 27, 1999, Genusa visited Dr. Samir Samuel Missak, M.D., at Dickenson County Medical Center. (R. at 330-38.) Genusa underwent a CT scan of his lumbar spine and x-rays of his chest, lumbar spine and right hip. (R. at 230-38.) The PA and lateral views of Genusa's chest showed degenerative changes in his spine but that his lungs were clear and his heart size normal. (R. at 235.) The radiologist determined that Genusa suffered from no active disease in his chest. (R. at 235.) AP and lateral views of Genusa's spine showed mild degenerative changes at L1-2, L2-3 and L3-4 but no fracture or subluxation, while they revealed normal sacroiliac joints. (R. at 231.) Views of Genusa's right hip showed no gross fracture or dislocation, although there was slight foreshortening of the femoral neck, which could have been congenital or related to an old injury. (R. at 231.) The CT scan revealed a right-sided bulge in Genusa's disc annulus where there was small focal herniation and a large spur formed at L3-4, narrowing the right lateral recess and neural foramen and impinging on the existing nerve root. (R. at 231.) The CT scan also showed degenerative facet disease, which was most severe at L4-5, a mild left-sided disc bulge at L4-5 that slightly narrowed the left lateral recess and neural foramen and a mild diffuse bulge in the disc annulus. (R. at 231.) Dr. Missak diagnosed Genusa with chest pain, back pain, right leg pain and right hip pain. (R. at 230, 232.) Dr. Missak also had tests performed on Genusa's blood and determined that Genusa suffered from tiredness, lack of energy and dyspnea. (R. at 233.)

-8-

Genusa returned to Dickenson County Medical Center on February 7, 2000, for x-rays of his right shoulder. (R. at 228-29.) The images showed no evidence of acute or focal bone changes, and the soft tissues were normal. (R. at 229.)

On July 12, 2000, Genusa had his blood tested at Dickenson County Medical Center. (R. at 226-27.) Genusa's PSA level led Dr. Missak to diagnose Genusa with urinary retention. (R. at 226.)

Upon a referral from Dr. Missak, Genusa visited Sullivan Digestive Center on July 27, 2000, for treatment of abdominal pain and diarrhea. (R. at 247-49.) Genusa reported that he had experienced long-term diarrhea, and his bouts would last for six to 12 months at a time. (R. at 247.) An abdominal exam revealed a normal-sized liver and a normal-sized spleen with no masses or severe tenderness. (R. at 248.) Dr. Michael J. Sullivan, M.D., diagnosed Genusa with chronic diarrhea and upper abdominal pain and suggested Genusa undergo a colonoscopy and endoscopy to rule out inflammatory bowel disease and gastric ulceration. (R. at 249.) Dr. Sullivan also opined that, although it may be secondary to his other diagnoses, Genusa was a candidate for Crohn's disease. (R. at 249.)

Genusa underwent a colonoscopy and endoscopy on August 8, 2000, at Sullivan Digestive Center. (R. at 244-46.) The procedure was performed to check Genusa's upper digestive tract for the source of his pain and to look for inflammatory bowel disease and Crohn's disease. (R. at 244.) The endoscopy indicated that Genusa suffered from reflux esophagitis, chronic gastritis, retained fluid in the stomach and duodenitis of the duodenal bulb. (R. at 245.) The colonoscopy revealed

-9-

that Genusa had a redundant atonic colon, while the rest of the examination was normal to the cecum. (R. at 246.) Based on these findings, Dr. Sullivan determined that Genusa suffered from fecal overflow and irritable bowel syndrome, with his problems with diarrhea possibly being secondary to a fecal overflow. (R. at 246.) Dr. Sullivan gave Genusa a proton pump inhibitor for his gastritis and suggested Genusa take Metamucil or Citrucel. (R. at 246.)

Upon request from Dr. N.C. Ratliff, M.D., Dickenson County Medical Center x-rayed Genusa's cervical, thoracic and lumbar spine on October 29, 2002. (R. at 250-51.) The x-rays revealed that Genusa had degenerative changes at C4-C5 and lipping at several levels in his thoracic spine with slight concavity superior at plate T7, probably of some duration. (R. at 251.) The x-rays also showed degenerative changes that were most prominent at L3-L4 in the lumbar region. (R. at 251.)

Genusa visited the office of James P. Senter, M.D., on November 25, 2002, to establish Dr. Senter as his primary care provider. (R. at 139-40.) Genusa complained of upper and lower back pain and neck pain with headaches. (R. at 139.) Genusa denied any recent trauma to his neck but reported that he had been working overhead frequently. (R. at 139.) Genusa relayed that Goody's Headache Powders and ibuprofen no longer quelled his pain, and he had difficulty sleeping because of the pain. (R. at 139.) B. Shinall, F.N.P., assessed Genusa with cervical neck pain, lumbar pain and depression. (R. at 139.) Shinall recommended physical therapy for Genusa's neck and back, prescribed Darvocet, Ultram, Paxil, Elavil and Percocet and scheduled MRIs of Genusa's lumbar, cervical and thoracic spine. (R. at 139.)

On December 2, 2002, Genusa attended physical therapy at Dominion Health and Fitness. (R. at 156-57.) The physical therapist created a program for Genusa, whereby he was to attend physical therapy three times a week for a month in order to decrease his pain and to increase his function using moist heat, electrical stimulation, ultrasound and massage, if needed, followed by therapeutic exercise for his range of motion, stretching and strengthening. (R. at 157.) The record indicates that Genusa cancelled six physical therapy sessions within the month. (R. at 154.)

On December 10, 2002, Genusa underwent MRIs and x-rays of his lumbar, cervical and thoracic spine at St. Mary's Hospital. (R. at 141-46.) The results of the MRI on Genusa's lumbar spine showed moderately severe L3-4 spondylosis with borderline spinal stenosis secondary to disc protrusion, facet arthrosis and spondylolisthesis. (R. at 141.) The MRI on Genusa's cervical spine showed minimal mutilevel spondylosis with no radiculopathic lesions, while the MRI on Genusa's thoracic spine showed small left posterior paracentral T7-8 soft disc protrusion. (R. at 142-43.) The x-rays confirmed that Genusa had spondylosis. (R. at 144-46.)

On December 30, 2002, Genusa returned to Dr. Senter's office for a reevaluation and medication refills. (R. at 137-38.) Genusa complained of continued chronic cervical neck pain and lumbar pain but did admit that physical therapy had helped for a short time period. (R. at 137.) Genusa indicated that his medication helped ease his pain but not to a tolerable level where he could work or sleep. (R. at 137.) Genusa relayed that the pain also completely interfered with his general activity, enjoyment of life and ability to concentrate. (R. at 138.) Shinall diagnosed Genusa with cervical neck pain, lumbar pain, depression and male erectile

dysfunction. (R. at 137.) Genusa was prescribed Viagra, Wellbutrin, Elavil and Percocet. (R. at 137.)

On January 28, 2003, Genusa visited Dr. Senter's office with complaints of continued chronic cervical neck pain and lumbar pain. (R. at 135-36.) Genusa reported that his medicine helped decrease his symptoms but that he was unable to increase his activity level. (R. at 135.) Shinall assessed Genusa with cervical neck pain, lumbar pain and depression and prescribed Elavil, Wellbutrin and Percocet. (R. at 135.)

Genusa returned to Dr. Senter's office on February 24, 2003, for reevaluation and medication refills. (R. at 133-34.) Genusa reported that he now experienced only 10 days a month of intolerable pain whereas he used to experience constant intolerable pain. (R. at 133.) Genusa indicated that he had successfully increased his activity level. (R. at 133.) Shinall diagnosed Genusa with cervical neck pain, lumbar pain and depression and prescribed Wellbutrin and Percocet and encouraged Genusa to continue increasing his activity level. (R. at 133.)

On March 24, 2003, Genusa visited Dr. Senter's office complaining of severe neck pain that had started after he lifted 35-pound speakers. (R. at 131-32.) Genusa indicated that his medication had been effective in decreasing his symptoms. (R. at 131.) Shinall assessed Genusa with cervical neck pain, lumbar pain, depression and birthmarks, for which he referred Genusa to Dr. D'Amato, a surgeon. (R. at 131.) Genusa also was prescribed Percocet. (R. at 131.)

-12-

Genusa returned to Dr. Senter's office on April 22, 2003, for a reevaluation and medication refills. (R. at 129-30, 147-48.) Genusa complained of chronic cervical neck and lumbar pain and generalized joint pain, especially in his hands and feet, although he relayed that overall he felt much better. (R. at 129.) Lab reports indicate that Genusa's total cholesterol was 203 H mg/dL, his triglycerides were 176 H mg/dL and his HDL cholesterol was 72 H mg/dL. (R. at 148.) As a result, Shinall diagnosed Genusa with hyperlipidemia, in addition to other diagnoses of arthraliga, cervical neck pain, lumbar pain, depression and fatigue. (R. at 129.) Shinall prescribed Percocet and Celebrex for Genusa. (R. at 129.)

On May 27, 2003, Genusa returned to Dr. Senter's office presenting complaints of depression and obsessive compulsive disorder, ("OCD"). (R. at 127-28.) Genusa recounted that Wellbutrin helped decrease his depressive symptoms. (R. at 127.) Shinall determined that Genusa suffered from arthralgia, cervical neck pain, lumbar pain and depression and prescribed Wellbutrin and Percocet. (R. at 127.)

Over the next few months, Genusa continued visiting Dr. Senter's office for evaluation and adjustments in his medication. (R. at 121-26.) Genusa consistently reported that, while he continued to have chronic cervical neck pain and lumbar pain, he suffered less from depression and OCD. (R. at 121-26.) Genusa also relayed that Wellbutrin eased his depressive symptoms to an extent where he could increase his activity level. (R. at 121-26.) In turn, Genusa found that small things no longer bothered him (R. at 125.)

On June 24, 2003, Shinall completed a Mental Status Evaluation Form for

-13-

Genusa. (R. at 149-53.) Shinall reported that for the last five years, Genusa had remained isolated and stayed at home. (R. at 150.) Shinall also reported that Genusa suffered from insomnia and a decreased appetite. (R. at 150.) Shinall noted that Genusa was coherent and well-dressed for his appointment but had a depressed affect. (R. at 151.) Shianll documented no suicidal ideation or attempts or delusions or hallucinations. (R. at 151.) Shinall further described Genusa's attention span, concentration, persistence, task completion and ability to perform calculations and abstract reasoning as "well" and his judgment as "ok." (R. at 152.) However, Shinall did report that Genusa became verbally abusive when he was under stress. (R. at 152.)

Julie Jennings, PH.D., a state agency psychologist, completed a Psychiatric Review Technique Form, ("PRTF"), for Genusa on July 24, 2003. (R. at 158-73.) Jennings determined that Genusa suffered from a depressive syndrome and possibly OCD but found that neither impairment was severe. (R. at 158, 163-64.) Jennings further found that Genusa was mildly limited in activities of daily living, in maintaining social functioning and in maintaining concentration, persistence or pace but was not limited by episodes of decompensation. (R. at 169.) Jennings added that Genusa's symptoms were partially credible. (R. at 171.) These findings were affirmed by Hugh Tenison, Ph.D., another state agency psychologist on December 1, 2003. (R. at 158.)

On August 25, 2003, Genusa conveyed to Shinall at Dr. Senter's office that he had difficulty with left elbow tendonitis. (R. at 121.) Genusa was given a Depo-Medrol and Lidocaine injection in his left lateral epicondyle, which immediately

-14-

decreased his symptoms. (R. at 121.)

Dr. Kevin Blackwell, D.O., completed a Medical Consultant Report for Genusa after an August 15, 2003, evaluation. (R. at 174-77.) At this evaluation, Dr. Blackwell x-rayed Genusa's bilateral hips, AP pelvis, shoulders and hands. (R. at 180-84.) The x-ray of Genusa's hips and pelvis showed some deformity of his right femoral head and alteration in the appearance of his femoral neck, although there was not a significant amount of deformity. (R. at 180.) The remaining bony structures appeared intact, but slight flaring was noted at the anterior aspect of the right acetabulum as compared to the left with a more flattened angle on the left and an elevated angle on the right. (R. at 180.) The remainder of Genusa's hip and pelvis x-ray was unremarkable. (R. at 180.) The x-ray of Genusa's left shoulder showed no acute radiographic abnormality, while the x-ray of his right shoulder revealed some mild degenerative change in the AC joint with mild inferior osteophyte formation of the clavicle. (R. at 181-82.) The x-ray of Genusa's left hand showed no fracture or dislocation, but there was small 2 millimeter density at the radial aspect of the PIP joint on the fifth finger, which could have represented some ossification of the soft tissue or possibly a small old avulsion. (R. at 183.) The images from Genusa's right hand showed no fracture or dislocation, and the rest of his x-ray was unremarkable, except for some degenerative change at his trapezium and scaphoid carpal bone. (R. at 184.)

Dr. Blackwell noted that Genusa was alert, cooperative and oriented times three with a good mental status. (R. at 175.) Dr. Blackwell assessed Genusa with chronic back pain and multiple joint pains. (R. at 176.) Dr. Blackwell opined that Genusa

-15-

would be limited to lifting items weighing no more than 30 pounds maximally and 18 to 20 pounds frequently. (R. at 176.) Dr. Blackwell determined that Genusa was capable of sitting for eight hours in an eight-hour workday and of standing for six hours in an eight-hour workday. (R. at 176.) Dr. Blackwell found no limitation in Genusa's ability to use his hands, but indicated that Genusa should avoid squatting, kneeling, crawling, stooping or repetitive waist bending, particularly when carrying a load. (R. at 176.) Dr. Blackwell further opined that Genusa could have difficulty lifting items weighing more than 20 pounds maximally overhead and should keep overhead activity lifts, regardless of weight, to less than 20 percent of any given day. (R. at 176-77.)

On August 28, 2003, Dr. Frank M. Johnson, a state agency physician, completed a Residual Physical Functional Capacity Assessment for Genusa. (R. at 185-92.) Dr. Johnson concluded that Genusa could occasionally lift and/or carry items weighing up to 20 pounds, frequently lift and/or carry items weighing up to 10 pounds, stand and/or walk about three hours in an eight-hour workday and sit with normal breaks for about six hours in an eight-hour workday. (R. at 186.) However, Dr. Johnson made the above findings regarding Genusa's ability to stand without consulting additional x-rays of Genusa's hip. (R. at 192.) Dr. Johnson later opined that Genusa's MRI dated December 10, 2002, showed spinal stenosis, which could make it difficult for Genusa to stand longer than two to three hours. (R. at 192.) Dr. Johnson also found that Genusa's ability to push and/or pull was limited in his lower extremities, namely his back. (R. at 186.) In making his assessment, Dr. Johnson relied on Genusa's allegations of seven damaged and degenerated discs, which caused nerve damage to his hip and shoulders and severe pain, which rendered him unable

-16-

to sit, stand, walk or lift without pain. (R. at 186.) Dr. Johnson further relied on Genusa's allegations of sleep difficulty and depression and on Genusa's daily activities, which included driving, reading, writing and watching movies but no housework or yard work due to his pain. (R. at 186.) Dr. Johnson found Genusa's allegations partially credible based on the most recent objective evidence. (R. at 187.) Dr. Johnson also found that Genusa could frequently climb and balance but could only occasionally stoop, kneel, crouch or crawl. (R. at 188.) Dr. Johnson found that Genusa had no manipulative limitations except a restriction from reaching in all directions on the left side. (R. at 188.) Johnson assessed that Genusa had no visual limitations, communicative limitations or environmental limitations. (R. at 189-90.) Dr. Johnson's findings were affirmed on December 1, 2003, by Dr. Richard M. Surrusco, M.D., another state agency physician. (R. at 192.)

On October 20, 2003, Genusa visited Dr. Senter's office with complaints of chronic cervical neck pain and lumbar pain and symptoms of depression. (R. at 119-20.) Although Genusa denied alcohol usage other than an eight-ounce glass of wine with dinner, Shinall noticed an odor of alcohol on Genusa. (R. at 119.) Therefore, Shinall advised Genusa to avoid drinking alcohol while on his medication. (R. at 119.) Shinall assessed Genusa with arthralgia, cervical neck pain, degenerative disc disease of the lumbosacral spine and depression and prescribed Restoril and Percocet (R. at 119.)

Genusa returned to Dr. Senter's office on November 11, 2003, for treatment of a cough, chest congestion and diarrhea. (R. at 118-19.) Genusa explained that he had received no relief from over-the-counter medications. (R. at 118.) Upon an

examination, Shinall noted that Genusa's posterior pharynx had mild erythema, and he had cervical lymphadenopathy. (R. at 118.) Genusa also had an expiratory wheeze, and his lungs were diminished in the bases. (R. at 188.) Shinall diagnosed Genusa with bronchitis and prescribed Levaquin and Lufyllin. (R. at 118.)

On November 17, 2003, Genusa returned to Dr. Senter's office for reevaluation and medication refills. (R. at 116-17.) Genusa reported that he continued to have chronic cervical neck pain and lumbar pain but that he felt much better overall. (R. at 116.) Genusa stated that the antibiotics had controlled his chest congestion but that he had ceased using Wellbutrin because he felt better when not taking it. (R. at 116.) Shinall assessed Genusa with arthralgia, cervical neck pain, degenerative disc disease of the lumbosacral spine and depression. (R. at 116.) Genusa was prescribed Percocet and Restoril. (R. at 116.)

Genusa returned to Dr. Senter's office on December 15, 2003 for reevaluation and medication refills. (R. at 204-05.) Genusa complained of chronic cervical neck pain and lumbar pain in addition to muscle aches, cough, diarrhea and congestion. (R. at 204.) Shinall diagnosed Genusa with flu syndrome, sinusitis, arthralgia, cervical neck pain, degenerative disc disease of his lumbosacral spine and depression. (R. at 204.) Shinall prescribed Restoril, Levaquin and Percocet and instructed Genusa to increase his intake of fluids. (R. at 204.)

On January 20, 2004, Genusa visited Dr. Senter's office with complaints of increased pain. (R. at 202-03.) On a scale of one to 10, with 10 being the most severe pain, Genusa rated his pain at a 10. (R. at 203.) In particular, Genusa highlighted his

-18-

increase in right elbow pain, for which he denied any repetitive motions or activity that would cause the discomfort. (R. at 202.) Genusa further described his pain as completely interfering with every aspect of his life. (R. at 203.) Genusa also complained of an increase in depressive symptoms and requested that he be restarted on Wellbutrin. (R. at 202.) Upon an examination, Shinall noted that Genusa's affect was depressed and that he had tenderness down the right forearm and in the posterior cervical neck and lumbar paraspinous muscles with discomfort on range of motion and flexion. (R. at 202.) Shinall determined that Genusa had a decreased range of motion due to his pain. (R. at 202.) Shinall diagnosed Genusa with arthralgia, right elbow pain, cervical neck pain, degenerative disc disease of his lumbosacral spine and depression. (R. at 202.) Shinall referred Genusa to a rheumatologist, injected his right lateral epincondyle with Depo-Medrol and Lidocaine, which immediately decreased Genusa's pain, and prescribed Celebrex, Lortab, Wellbutrin and Restoril. (R. at 202.)

Genusa returned to Dr. Senter's office on February 18, 2004, for a check-up. (R. at 200-01.) Genusa complained of his usual symptoms but added that he had been experiencing sleep difficulty. (R. at 200.) Genusa informed Shinall that Lortab had interfered with his normal bowel movements, and he had experienced constipation, diarrhea and abdominal pain as a result. (R. at 200.) Genusa also indicated that his elbow pain had been resolved with the last injection. (R. at 200.) Shinall assessed Genusa with arthralgia, cervical neck pain, degenerative disc disease of the lumbosacral spine and depression. (R. at 200.) Genusa was referred to an arthritis specialist, instructed to use Wellbutrin, prescribed Restoril, Percocet and Nasacort and given a Z-Pack. (R. at 200.)

On March 18, 2004, Genusa returned to Dr. Senter's office with complaints of chronic arthritic pain at several sites, chronic cervical neck pain, lumbar pain, hand pain, finger pain and right elbow pain. (R. at 198-99.) An examination revealed that Genusa was tender over several finger joints, which were swollen but not red, and that his finger joints were enlarged. (R. at 198.) Dr. Senter noted that Genusa was tender in the posterior cervical neck paraspinous muscles with pain on palpation and movement through the range of motion. (R. at 198.) Dr. Senter also found Genusa tender in the lumbar paraspinous muscles with pain on palpation and flexion. (R. at 198.) Dr. Senter diagnosed Genusa with arthritis, degenerative disc disease of the lumbosacral spine and cervical neck pain and prescribed Percocet. (R. at 198.)

Genusa visited Mountain Comprehensive Health Corporation on March 25, 2004, for treatment of his polyarthralgias. (R. at 212-13.) Dr. Mary Ann Domingo, M.D., a rheumatologist, found no active synotitis on examination, and a Schober's test and chest expansion measurement were normal. (R. at 212.) However, in light of Genusa's family history of lower back and hip disease, Dr. Domingo opined that Genusa probably suffered from spondyloarthropathy. (R. at 212.) Dr. Domingo advised Genusa to stop using Goody's Headache Powders and to start taking Celebrex. (R. at 212.) X-rays of Genusa's lumbar spine, bilateral SI joint and thoracic spine were also taken. (R. at 215-17.) The x-rays of Genusa's lumbar spine showed anterior osteophytes at the level of L4-L3 but no evidence of spondylolysis or spondylolisthesis. (R. at 215.) The images from the bilateral SI joint x-ray indicated that there was no sclerosis and no evidence of fracture or sacroiliitis. (R. at 216.) The x-ray of Genusa's thoracic spine also showed no evidence of acute fracture. (R. at 217.)

-20-

Genusa visited Dr. Senter's office on April 15, 2004, with complaints of continued pain, although he related that the medication was effective in decreasing his symptoms to an extent where he had been able to increase his activity level. (R. at 196-97.) Shinall assessed Genusa with arthritis, degenerative disc disease of the lumbosacral spine and cervical neck pain, for which he prescribed Wellbutrin, Celebrex and Percocet. (R. at 196.)

On June 15, 2004, Genusa visited Dr. Senter for a follow-up. (R. at 255-56.) Dr. Senter noted that Genusa was in no distress, while his affect was normal and appropriate. (R. at 255.) Dr. Senter assessed Genusa with osteoarthritis, degenerative disc disease of his lumbosacral spine and cervical neck pain. (R. at 255.) Dr. Senter prescribed Percocet. (R. at 255.)

On May 18, 2004, Dr. Senter and Shinall completed a Medical Assessment Of Ability To Do Work-Related Activities (Physical) for Genusa. (R. at 206-07.) Dr. Senter concluded that Genusa's ability to lift/carry was affected by his impairment, with items weighing 15 pounds being the maximum Genusa could carry occasionally and items weighing 10 pounds being the maximum Genusa could carry frequently. (R. at 206.) Dr. Senter based this determination on Genusa's pain in his arms, neck and back and numbness in his hands and forearms. (R. at 206.) Dr. Senter also found that Genusa's pain and his need for frequent postural changes affected his standing, walking and sitting, for Genusa could stand for only three hours and could not stand without interruption for more than 30 minutes. (R. at 206.) Dr. Senter determined that Genusa could sit for two hours but could not sit without interruption for more than 30 minutes because of pain in his back and neck. (R. at 206.) Dr. Senter

-21-

concluded that Genusa could occasionally climb, stoop and kneel but could never balance, crouch or crawl because pain from his multi-level spondylosis and spinal stenosis prevented these positions. (R. at 207.) Dr. Senter further found that seeing, hearing, speaking and feeling were not affected by Genusa's impairment but that reaching, handling and pushing/pulling were affected by his decreased ability to move his arms due to the pain in his back and neck. (R. at 207.) Dr. Senter also concluded that Genusa had environmental restrictions with regard to heights, moving machinery, temperature extremes and vibration but had no such environmental restrictions with regard to chemicals, dust, noise, fumes and humidity. (R. at 207.)

Dr. Senter and Shinall also completed a Medical Assessment Of Ability To Do Work-Related Activities (Mental) for Genusa on May 18, 2004. (R. at 209-10.) Dr. Senter concluded that Genusa would have a good ability to use judgment with the public and to function independently, a fair ability to follow work rules, to relate to co-workers, to deal with the public, to interact with supervisors and to maintain attention and concentration, but a poor or no ability to deal with work stresses. (R. at 209.) Dr. Senter based this conclusion on Genusa's anxiety, OCD, depression and irritability. (R. at 209.) In making performance adjustments, Dr. Senter found that Genusa would have an unlimited or very good ability to follow simple job instructions and a fair ability to follow complex job instructions and to follow detailed job instructions because of his short attention span. (R. at 210.) Furthermore, Dr. Senter concluded that Genusa would have a good ability to maintain personal appearance and to demonstrate reliability, while he would have a fair ability to behave in an emotionally stable manner and to relate predictably in social situations. (R. at 210.) Dr. Senter's determinations were based on Genusa's clean

Case 2:05-cv-00028-GMW-PMS   Document 15   Filed 03/09/06   Page 22 of 36   Pageid#: 92

appearance at office visits and his agitation and occasional aggression when stressed. (R. at 210.)

On June 22, 2004, Genusa returned to Mountain Comprehensive Health Corporation for a follow-up on his arthritis. (R. at 257.) Genusa complained that he had experienced soreness and stiffness for a day following 20 minutes of vacuuming. (R. at 257.) Dr. Domingo noted that there was no indication of any active synotitis, but there was some showing of nodal involvement of the ligament, which could be osteoarthritis. (R. at 257.) Since Genusa had responded well with Celebrex, Dr. Domingo advised Genusa to increase his dosage. (R. at 257.)

On August 7, 2004, Genusa was treated at the Dickenson Community Hospital for his abdominal pain. (R. at 258-69.) A x-ray taken of his abdomen demonstrated that his bony structures were intact. (R. at 269.) The bowel pattern was nonspecific without radiographic evidence of obstruction. (R. at 269.) Furthermore, Genusa's soft tissues as visualized were unremarkable, and no free air was noted. (R. at 269.) Genusa was given IV fluids for dehydration, and sent to Norton Hospital for a CT scan. (R. at 251.) The physicians at Norton Hospital were able to rule out appendicitis. (R. at 251.) Genusa was given Donnatal, Phenergan and some pain medication. (R. at 252.)

Genusa visited Dr. Senter's office on August 9, 2004, for reevaluation and medication refills. (R. at 252.) Genusa complained of diarrhea and an inability to eat foods but stated that his medicinal regimen was succeeding at pain management. (R. at 252.) Shinall diagnosed Genusa with abdominal pain, osteoarthritis, degenerative

-23-

disc disease of the lumbosacral spine and cervical neck pain. (R. at 252.) Genusa was given Avelox, Percocet and Nexium. (R. at 252.)

Genusa returned to Sullivan Digestive Center on August 12, 2004, with complaints of abdominal burning and pain that had lasted for the past three months. (R. at 242-43.) Genusa complained of accompanying diarrhea and constipation when he experienced this pain. (R. at 242.) Genusa stated that he also had problems with urinating. (R. at 242.) An abdominal exam revealed that Genusa had a normal-sized liver and normal-sized spleen, with no masses or severe tenderness. (R. at 243.) Dr. Sullivan opined that Genusa's intermittent abdominal pain portended of an infection, which was probably caused by a failure to move his bowels well. (R. at 243.) Dr. Sullivan diagnosed Genusa with abdominal pain and ordered another colonoscopy and endoscopy. (R. at 243.)

On August 24, 2004, Genusa underwent a colonoscopy and endoscopy at Sullivan Digestive Center. (R. at 239-41.) The endoscopy revealed that Genusa suffered from Candida esophagitis, chronic gastritis, a deep duodenal ulcer, duodenitis and a deformity of the duodenal bulb. (R. at 241.) The colonoscopy showed internal hemorrhoids and a redundant colon, but the rest of the examination was normal to the cecum. (R. at 241.) Dr. Sullivan attributed much of Genusa's pain to the ulcer and instructed Genusa to discontinue his use of Goody's Headache Powders and take Nexium and Carafate. (R. at 241.)

Dr. Senter and Shinall completed another Medical Assessment Of Ability To Do Work-Related Activities (Physical) for Genusa on September 7, 2004. (R. at 270-

71.) Dr. Senter concluded that Genusa's ability to lift/carry was affected by his impairment, with items weighing 10 pounds being the maximum Genusa could carry occasionally and items weighing five pounds being the maximum Genusa could carry frequently. (R. at 270.) Dr. Senter based this determination on Genusa's pain in his arms, neck and back. (R. at 270.) Dr. Senter also found that Genusa's could stand for only three hours and could not stand without interruption for more than 30 minutes. (R. at 270.) Dr. Senter determined that Genusa could sit for three hours but could not sit without interruption for more than 30 minutes because of his pain in his back and neck. (R. at 270.) Dr. Senter concluded that Genusa could only occasionally climb, stoop, kneel balance, crouch or crawl because of degenerative disc disease of his spine, pain and decreased range of motion. (R. at 271.) Dr. Senter further found that Genusa's seeing, hearing, speaking and feeling were not affected by his impairment but that reaching, handling and pushing/pulling were affected by osteoarthritis of the hand and joints and pain in his arms and neck. (R. at 271.) Dr. Senter also concluded that Genusa had environmental restrictions with regard to moving machinery and vibration but had no such environmental restrictions with regard to heights, temperature extremes, chemicals, dust, noise, fumes and humidity. (R. at 271.)

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2005); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1)

-25-

is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920 (2005). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in the process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2005).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy the burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 423(d)(2) (West 2004); 42 U.S.C.A. § 1382c(a)(3)(A)-(B) (West 2003); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated November 22, 2004, the ALJ denied Genusa's claim. (R. at 13-25.) The ALJ found that Genusa was insured for DIB purposes through November 22, 2004. (R. at 23.) Furthermore, the ALJ found that Genusa had not engaged in substantial gainful activity since the alleged onset of disability. (R. at 24.) The ALJ found that Genusa suffered from a severe musculoskeletal impairment, but that Genusa did not have an impairment or combination of impairments listed at or medically equal to one listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at

-26-

24.) The ALJ also found that Genusa's allegations regarding his limitations were not totally credible. (R. at 24.) After considering the medical opinions of record regarding the severity of Genusa's impairments and the testimony from a vocational expert, the ALJ found that Genusa had the residual functional capacity to perform a wide range of light work, which could be performed despite Genusa's need for postural changes every hour and his complete limitation in overhead lifting and of the following repetitive motions: bending at the waist, squatting, kneeling, crawling and stooping. (R. at 24.) Based on Genusa's residual functional capacity, the ALJ found that Genusa was able to perform his past relevant work. (R. at 24.) Based on Genusa's age, education, past work and residual functional capacity and the testimony of a vocational expert, the ALJ found that there were a significant number of jobs in the national economy that Genusa could perform, such as work as a food checker/cashier, parking lot attendant, information clerk, interviewer and desk clerk. (R. at 24.) Thus, the ALJ found that Genusa was not under a disability as defined by the Act at any time through the date of the decision and not eligible for benefits. (R. at 24.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2005).

Genusa argues the ALJ's decision was not based on the substantial evidence of the record. (Plaintiff's Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 8.) First, Genusa argues that the ALJ erred in finding that Genusa did not suffer from a severe mental impairment. (Plaintiff's Brief at 9-10.) Second, Genusa argues that the ALJ erred in failing to give proper weight to the opinions of his treating physician. (Plaintiff's Brief at 11-12 .) Third, Genusa argues that the ALJ erred in failing to properly consider the combined effect of Genusa's impairment on his ability to work. (Plaintiff's Brief at 12-13.) Fourth, Genusa argues

that the ALJ's determination of Genusa's residual functional capacity was not supported by substantial evidence. (Plaintiff's Brief at 13-15.) Fifth, Genusa argues that the ALJ erred in finding that his allegations of pain were not credible. (Plaintiff's Brief at 15-23.) Finally, Genusa argues that the ALJ erred in finding that there was work in the national economy that Genusa could perform. (Plaintiff's Brief at 23-25.)

The court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays,* 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d), 416.927(d), if he sufficiently explains his rationale and if the record supports his

-28-

findings.

Genusa argues that the ALJ erred in finding that he did not suffer from a severe mental impairment. (Plaintiff's Brief at 9-10.) Based on my review of the record, I find that substantial evidence supports the ALJ's finding as to the severity of Genusa's mental impairment.

The Social Security regulations define a "non-severe" impairment as an impairment that does not significantly limit a claimant's ability to do basic work activities. *See* C.F.R. §§ 404.1521(a), 416.921(a) (2005). Basic work activities include walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing, hearing, speaking, understanding, carrying out and remembering job instructions, use of judgment, responding appropriately to supervision, co-workers and usual work situations and dealing with changes in a routine work setting. *See* 20 C.F.R. §§ 404.1521(a), 416.921(b) (2005). The Fourth Circuit has held that "[a]n impairment can be considered as 'not severe' only if it is a *slight abnormality* which has such a *minimal effect* on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." *Evans v. Heckler* 734 F.2d 1012, 1014 (4th Cir. 1984)(quoting *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984)) (citations omitted).

The court finds that substantial evidence supports the ALJ's ruling that Genusa did not suffer from a severe mental impairment. The record is essentially devoid of any evidence that Genusa's depression or OCD significantly limit his ability to do basic work activities. To the contrary, Genusa has indicated on multiple occasions

-29-

that Wellbutrin is effective in treating his depressive symptoms. (R. at 121-27, 135, 196-97.) Genusa stated on both March 24, 2003, and April 15, 2004, that Wellbutrin treated his depressive symptoms to an extent that he was able to increase his activity level. (R. at 133, 196-97.) When Genusa stopped taking Wellbutrin on his own accord, he requested to be restarted on it within two months. (R. at 116, 202.) Genusa even stated at his hearing that Wellbutrin calmed him and helped him accept his physical limitations. (R. at 310-11.) Genusa did not mention his alleged OCD during the hearing. Although Genusa also stated during the hearing that his doctors planned to refer him to mental health specialist, none of his doctors had found Genusa's symptoms sufficiently severe to warrant a referral up to that point. (R. at 312-13.)

The ALJ's finding also is supported by Dr. Blackwell's conclusion that Genusa had a good mental status and Julie Jennings's determination that Genusa did not suffer from a severe mental impairment. (R. at 158, 163-64, 175.) Jennings found that Genusa was only mildly limited in activities of daily living, in maintaining social functioning and in maintaining concentration, persistence or pace, while he was not limited by episodes of decompensation. (R. at 169.) Genusa highlights the findings of Dr. Senter, his treating physician, in his argument that he suffers from a severe mental impairment. (Plaintiff's Brief at 9-11.) However, as the ALJ noted, neither Dr. Senter nor his nurse practitioner, Shinall, were experts in the mental health field. (R. at 20-21.) Even Shinall described Genusa's attention span, concentration, persistence, task completion and ability to perform calculations and abstract reasoning as "well" and his judgment as "ok." (R. at 152.) Also, Dr. Senter only saw Genusa twice throughout Genusa's treatment at his office. (R. at 198-99, 255-56.) In the Medical Assessment Of Ability To Do Work-Related Activities (Mental)

Case 2:05-cv-00028-GMW-PMS   Document 15   Filed 03/09/06   Page 30 of 36   Pageid#: 100

completed by Dr. Senter and Shinall, even they found that Genusa had a good ability to use judgment with the public and to function independently, while he had a fair ability to follow work rules, to relate to co-workers, to deal with the public, to interact with supervisors and to maintain attention and concentration. (R. at 209.) The only adjustment that they found would be poor is Genusa's ability to deal with work stresses. (R. at 209.) Based on the fact that Genusa's depression was successfully treated with medication prescribed by his treating physician, it is a slight abnormality with a minimal effect on his life and no effect on his ability to perform basic work activities. Thus, the ALJ properly found that Genusa did not suffer from a severe mental impairment.

Genusa further argues that the ALJ erred in failing to give proper weight to the opinions of Genusa's treating physicians. (Plaintiff's Brief at 11-12.) The ALJ must consider objective medical facts and the opinions and diagnoses of both treating and examining medical professionals, which constitute a major part of the proof of disability cases. *See McLain v. Schweiker*, 715 F.2d 866, 869 (4th Cir. 1983). The ALJ must generally give more weight to the opinion of a treating physician because that physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2005). However "circuit precedent does not require that a treating physician's testimony be given controlling weight." *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992)). In fact, "if a physician's opinion is not supported by the clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590. When the ALJ does not give the treating source's opinion controlling weight, the ALJ

-31-

applies the following factors to determine what weight to give the opinion: (1) length of the treatment relationship and the frequency of examination, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

In rejecting the opinions of Dr. Senter and Shinall, his nurse practitioner, as to Genusa's mental impairment, the ALJ found their opinions inconsistent with the record. (R. at 21.) The ALJ noted Dr. Senter's and Shinall's lack of expertise in the mental health field and Genusa's lack of treatment by any mental health specialist. (R. at 21.) Furthermore, the ALJ found that both the opinions of Dr. Blackwell and Julie Jennings were inconsistent with Dr. Senter's and Shinall's opinions. (R. at 21.) The ALJ also found relevant that Dr. Senter's and Shinall's Medical Assessment Of Ability To Do Work-Related Activities (Mental) was inconsistent with their own office visit notes, which often indicate that Genusa had an "appropriate affect." (R. at 21, 255.) As a result of the fact that the ALJ applied the factors set forth in 20 C.F.R. § 404.1527(d)(2) and § 416.927(d)(2) and the opinions from Dr. Senter and Shinall were inconsistent with other substantial evidence, the court finds that substantial evidence supports the ALJ's decision to discredit their opinions.

Genusa also argues that the ALJ failed to consider the combined effect of his impairments on his ability to work. (Plaintiff's Brief at 12-13.) An ALJ must consider the combined effect of a claimant's impairment to determine "whether an individual's impairments are of sufficient severity to prohibit basic work related activities." *Hines v. Bowen*, 872 F.2d 56, 59 (4th Cir. 1989) (per curium) (citing *Reichenbach v. Heckler*, 808 F.2d 309, 312 (4th Cir. 1985)). Additionally, "the ALJ

must adequately explain his or her evaluation of the combined effect of impairments." *Reichenbach*, 808 F.2d at 312.

The court finds that the ALJ adequately considered the combined effect of all of Genusa's impairments on his ability to work, including his alleged mental impairments. The ALJ documented and thoroughly described each of Genusa's medical visits in his evaluation, including each alleged ailment. (R. at 18-21.) He then explained why each ailment was not disabling. (R. at 21.) Genusa's argument hinges on the allegation that the ALJ did not afford due weight to his mental impairments. (Plaintiff's Brief 12-13.) However, as the court previously held, the ALJ properly concluded that Genusa did not suffer from a severe mental impairment. The ALJ determined that Genusa's mental impairments had no significant limitation on his functioning because they were successfully treated with medication from his treating physician. (R. at 21.) The ALJ also found relevant the fact that Genusa's affect was almost always appropriate and nondistressed during office visits with Dr. Senter and Shinall, and both Dr. Blackwell and Jennings found Genusa's mental impairment to be nonsevere. (R. at 21.) The ALJ then considered the combined effect of Genusa's nonsevere mental impairments and his severe musculoskeletal impairments. (R. at 21.) The ALJ next determined that Genusa's musculoskeletal impairments were not disabling, in part, because the pain medication prescribed to Genusa and their accompanying dosages were for only "mild to moderate" pain. (R. at 21.) The ALJ also considered medical reports that indicate Genusa was able to work and clean his house. (R. at 20.) Since the ALJ adequately addressed each of Genusa's ailments, he properly considered the combined effect of his impairments on his ability to work

-33-

Genusa also argues that substantial evidence does not support the ALJ's determination of Genusa's residual functional capacity. (Plaintiff's Brief at 13-15.) After a review of the record, the court finds that substantial evidence does not support the ALJ's finding that Genusa was capable of a wide range of light work with the only restrictions being that Genusa would need to have frequent postural changes and could not engage in overhead lifting or repetitive: bending at the waist; squatting; kneeling; crawling; or stooping. According to the regulations, work is light if it "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing." 20 C.F.R. §§ 404.1567(b), 416.967(b) (2005). The regulations further state that "an individual must have the ability to do substantially all of these activities" in order to be capable of "light work." 20 C.F.R. §§ 404.1567(b), 416.967(b).

Dr. Senter and Shinall concluded on both May 18, 2004, and September 7, 2004, that Genusa could stand for only three hours and could not stand without interruption for more than 30 minutes. (R. at 206.) A state agency physician, Dr. Johnson, also found that Genusa could stand for only two to three hours without severe pain due to Genusa's spinal stenosis. (R. at 192.) Dr. Johnson further found that Genusa could have difficulty with prolonged standing. (R. at 192.) Dr. Johnson's findings were affirmed by Dr. Surrusco. (R. at 192.) In the ALJ's decision, the ALJ stated that he relied on Dr. Johnson's findings and found them consistent with the overall record. (R. at 20.) However, the ALJ did not include limitations on Genusa's walking and standing in his computation of Genusa's residual functional capacity. In order to find that an individual is capable of "light work,"

-34-

he/she must be able to perform substantially all of the activities that encompass "light work." Dr. Johnson's restrictions on Genusa's standing and walking, which the ALJ admittedly accepted, along with Dr. Senter's and Shinall's opinions, do not support a conclusion that Genusa can perform the walking and standing that light work entails. As Cathy Sanders confirmed, a limitation of being able to stand for three hours in an eight-hour workday and to sit for only three hours in an eight-hour workday does not allow for a full range of light or sedentary work. (R. at 317.) None of the ALJ's additional restrictions on Genusa's residual functional capacity address Genusa's limitation in walking and standing. That being the case, the court finds that substantial evidence does not exist in this record to support the ALJ's finding that Genusa can do a wide range of light work without further restrictions on his standing and walking.

Based on the court's finding that substantial evidence does not support the ALJ's finding of Genusa's residual functional capacity, it is not necessary to address Genusa's other arguments.

## IV. Conclusion

For the foregoing reasons, I will overrule Genusa's and the Commissioner's motions for summary judgment, vacate the Commissioner's decision denying benefits and remand Genusa's claim for benefits to the Commissioner for further consideration.

DATED:    This ___8th___ day of March 2006.

_____
SENIOR UNITED STATES DISTRICT JUDGE

-36-